**WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sandor Torgyik,<br><br>    Plaintiff,<br><br>v.<br><br>GMPH One Incorporated,<br><br>    Defendant. | No. CV-16-04431-PHX-DJH<br><br>**AMENDED ORDER**[1] |

Pending before the Court are the following Motions: Plaintiff's Motion for Findings and Conclusions and Entry of Final Judgment (Doc. 85) and Defendant's Response (Doc. 91); Defendant's Renewed Judgment as a Matter of Law (Doc. 88), Plaintiff's Response (Doc. 95), and Defendant's Reply (Doc. 97); Defendant's Motion for New Trial (Doc. 89), Plaintiff's Response (Doc. 96), and Defendant's Reply (Doc. 98); and Plaintiff's Application for Attorney's Fees (Doc. 83), Defendant's Response (Doc. 90), and Plaintiff's Reply (Doc. 93). The Court now issues its Order.

The Court will first address Defendant's Renewed Judgment Motion and his Motion for a New Trial as a determination of those motions may obviate the need to address all other motions.

**I.   Background**

Sandor Torgyik ("Plaintiff") filed a complaint alleging that his employer, GMPH

---
[1] This Amended Order is issued to amend page 18, line 19 of the Court's March 31, 2019 Order (Doc. 99).

One, Inc., doing business as "Southwest Collision" ("Defendant"), fired him in violation of the Age Discrimination in Employment Act ("ADEA"),[2] the Arizona Civil Rights Act ("ACRA"),[3] and the Arizona Employment Protection Act.[4] (Doc. 1). Plaintiff alleged that George Galowicz, ("Galowicz") is an officer and director of Defendant. Galowicz hired Plaintiff as a body technician on October 31, 2011. Plaintiff was sixty-years old at the time of his hiring. In September 2015, Galowicz asked Plaintiff how much longer he intended to work. (*Id*. at 2). Plaintiff replied, "a couple more years." (*Id*.) Thereafter, Plaintiff alleged that his work assignments became more limited and that Galowicz tried to convince Plaintiff to take a job at another body shop. (*Id*. at 3). Plaintiff stated that he visited the other body shop and determined that it was not suitable. (*Id*.) On December 2, 2015, Plaintiff was fired from Southwest Collision by Kevin "KJ" Nellis ("KJ"). (*Id*.) Plaintiff alleged that Galowicz instructed KJ to fire him. (*Id*.)

The case proceeded to jury trial on August 7, 2018. Plaintiff testified that he was paid an hourly rate of $18.00 measured by "flag hours." (Certified Trial Tr., Aug. 7, 2018 at Doc. 87 at 20 ("Tr. 8/7/18")). "[F]lag hours" are the number of hours that an insurance company affixes to repair a particular car. (*Id.*) Regardless of the actual hours worked on that car, a body man would be paid the assigned flag hours. (*Id.*) Plaintiff testified that in May, June, July and August of 2015, he had over 100 hours of work. (*Id*. at 26); (*see also* Def.'s Tr. Ex. 132 (chart of Plaintiff's hours worked)). Then, in September, Plaintiff testified that his work-hour production went down because he was not being assigned the same number of cars as other shop technicians. (*Id.* at 26-27).

Plaintiff testified that KJ, the general manager, was responsible for work assignments. (*Id*. at 27). After he was not getting work in September, Plaintiff asked KJ "what's going on [] [a]re you guys going to force me out or what[?]" (*Id*.) Plaintiff went to Galowicz to see if he could get more work to which he replied, "[g]o talk to KJ." (*Id*.)

---

[2] 29 U.S.C. § 623(a).

[3] A.R.S. §§ 41-1416.

[4] A.R.S. § 23-1501.

At some point in September, Plaintiff was told that Galowicz wanted to speak with him. When Plaintiff met with Galowicz, he was asked "[h]ow long [are] you going to work here?" Plaintiff responded, "I figure about maybe a couple of more years and then I'm going to retire. I'm going to be 70, so I'm going to retire." (*Id*. at 29). Plaintiff testified that Galowicz said, "I have to let you go, Alex, because I need a younger body man so I can send them to school, because if I send you to school, [I'm] just wasting my money because you're going to be here with us for another two years, and you cannot produce like a younger body man." (*Id*. at 30). Galowicz testified that it was possible that he asked Plaintiff when he intended to retire because "[w]e always talk[ed] about retirement." (Uncertified Trial Tr., Aug. 8, 2018 at 185 ("UTr."))._[5]_ Plaintiff testified that, thereafter, he continued to work as usual. (Tr. 8/7/18 at 35-37).

Galowicz testified that Plaintiff's work had diminished in quality, that he refused to attend certification training, failed a training class, and that his work production had slowed. (UTr. 8/8/18). Galowicz testified that the shop's commercial fleet accounts, on which Plaintiff primarily worked, had also diminished. (*Id*.) Galowicz testified that all of these reasons were the basis for his searching for other part-time work in other body shops for Plaintiff. (*Id*.) Galowicz denied telling Plaintiff that he would be fired because he could not be sent to training school. (*Id*.)

Plaintiff testified that in November, Galowicz asked to meet with him again and said, "I'm going to try to find a job for you." (Tr. 8/7/18 at 31:21). Plaintiff testified that he did not want another job. (*Id.* at 31:22-23). Plaintiff testified that on November 24, KJ told him that "George wants you to go to the American Body Shop and take the job over there. They have a lot of work." (*Id.* at 32:3-5). Plaintiff visited the shop and based on his observations of it and conversations with the owner, he did not find it acceptable. (*Id*. at 34-36). The next day, Plaintiff met with Galowicz and said '[t]hey have no work over there. The body shop is close - - is dark, not even the lights on it[,] they have nothing there. And the place is dirty and looked like a dump." (*Id*. at 36:11-14). Plaintiff also testified

---
[5] The parties only requested certified transcripts of certain portions of the trial. Citations to "UTr." are to uncertified court transcripts from the particular day cited.

- 3 -

that around this time, Galowicz hired a younger body man, requiring him to move to a smaller work area. (*Id*. at 37).

Plaintiff testified that on the morning of December 2, he told KJ "If you guys don't want me over here because of my age, let me off or fire me," to which KJ responded, "I got to talk to George about it." (*Id*. at 49). After lunch, KJ asked to meet Plaintiff in Galowicz's office, and when he arrived, KJ said, "I have to let you go, and here is the paper to sign[.]" (*Id*. at 50). Plaintiff testified that when he looked at the paper it noted "George kept me for three months to [refinance] home." (Pl.'s. Tr. Ex. 5). Plaintiff stated that the two shook hands and KJ gave him a hug. (*Id*.)

Galowicz testified that he was not in the shop at the time Plaintiff was fired. (UTr. 8/8/18 at 140). He stated that KJ informed him that "Alex quit during [a] heated conversation" but later KJ clarified that "it was actually discharge." (*Id.*) Plaintiff's counsel asked KJ to "tell the jury [] the main reason that you decided to terminate Alex" and he said, "he did not produce the quality of work that I was required to sell[.] . . . we were looking to get him a new home for the previous three months [and] Southwest Collision did not have the accounts anymore for [Plaintiff] to work on." (*Id.* at 7). KJ further explained that "he was let go this exact day because he was very angry he was very profane . . . so we parted ways that day[.]" (*Id.* at 18-19). KJ further testified about a termination notice that he filled out explaining the termination. (*Id.* at 14-15).

Plaintiff testified that after he was fired from Southwest Collision on December 2, he attempted to find work by calling body shops. (Tr. 8/7/18 at 53). Plaintiff stated he had no luck as it was before Christmas and no one was hiring. (*Id*.) He eventually found a job in January at Van Chevrolet and he started work there as a body man on January 12, 2016. (*Id*. at 54). Plaintiff made $17.00 an hour there. (*Id*. at 55). Plaintiff stated that he worked at Van Chevrolet for three-months, but he had to give it up due to health issues related to his knees. (*Id*.) Plaintiff explained that after he quit working at Van Chevrolet, he sought work for four or five months but ultimately determined he was not able to work because he was scheduled to have a second knee surgery on December 21, 2016. (*Id.* at 54).

Plaintiff stated that between December 21, through March of 2017, he did not work. Plaintiff returned to work on February 7, 2018, as an auto body technician making $18.00 a flag hour. (*Id*. at 55).

On August 10, 2018, the jury returned a verdict in Plaintiff's favor finding that he had proven, by a preponderance of the evidence, that but for his age, he would not have been terminated. (Doc. 74). The jury awarded Plaintiff $44,109.30 in back pay. (*Id*.) The jury further found that Defendant's conduct in terminating Plaintiff was willful. (*Id*.)

**II.     Post-Trial Motions**

    **1.     Defendant's Renewed Motion as a Matter of Law (Doc. 88)**

After Plaintiff rested his case, Defendant moved for judgment as a matter of law "to terminate Plaintiff's damages on the date that he stopped working for his subsequent employer." (Doc. 88 at 1). Defendant's Rule 50(a) motion was supported by a memoranda arguing three points: (1) Plaintiff presented no testimony or other evidence about what he would earn over any period had he not been terminated and that there is no testimony that he would have continued to earn a commensurate amount; (2) he is not entitled to front pay because he obtained new employment on January 11, 2016 and he left five months later due to a knee injury; and (3) if the jury finds that he is entitled to back pay, "that terminated with his employment at Van Chevrolet beginning on January 11, 2016." (Doc. 64). As to the third point, citing jury instruction 11.13, Defendant argues that Plaintiff's "award of back pay should be reduced by the amount of damage that [he] actually avoided." (*Id*.) In the Rule 50(b) motion, Defendant seeks to limit Plaintiff's damages "to the period terminating on April 28, 2016" because "[a] reasonable jury could not have awarded more than [$7,532.93]" for damages. (Doc. 88 at 1). Plaintiff disagrees stating that his testimony showed that he was able to continue working until December 21, 2016. (Doc. 95 at 4).

        **a.     Legal Standards**

When the Court denies a party's Rule 50(a) motion, "the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed.R.Civ.P. 50(b). Post trial, a party is therefore permitted to

renew a motion for a judgment as a matter of law within the specified time. "In ruling on the renewed motion, the court may: (a) allow judgment on the verdict[;] (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.* A court must uphold the jury's award if there was any legally sufficient basis to support it. *Experience Hendrix L.L.C. v. Hendrixlicensing.com*, 762 F.3d 829, 842 (9th Cir. 2014) (citing *Costa v. Desert Palace Inc.*, 299 F.3d 838, 859 (9th Cir. 2002)). In determining whether there is a legally sufficient basis to support a jury's award of damages on a Rule 50(b) motion, a court must consider all of the record evidence and draw all inferences in favor of the nonmoving party. *Id.* In addition, the court may not make any credibility determinations or reweigh the evidence. *Id*.

Regarding an award of damages, a plaintiff has the burden of proving the existence and amount of damages by a preponderance of the evidence, while also taking reasonable measures to minimize his damages. *See Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338 (9th Cir. 1987), *cert. denied*, 484 U.S. 1047 (1988). A plaintiff "forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." *Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 232 (1982); *see also Caudle v. Bristow Optical Co., Inc.*, 224 F.3d 1014, 1020 (9th Cir. 2002) ("[P]laintiff seeking back pay [has] a duty to mitigate damages by seeking alternative employment with 'reasonable diligence.'"). Therefore, a plaintiff must attempt to mitigate damages by exercising reasonable care and diligence in seeking reemployment. *Cassino*, 817 F.2d at 134. However, the defendant bears the burden of proving that a plaintiff failed to mitigate his damages including that "there were suitable positions available and that the plaintiff failed to use reasonable care in seeking them. *Id.* (citing *Jackson v. Shell Oil Co.*, 702 F.2d 197, 202 (9th Cir. 1983)).

### b. Discussion

At close of trial, Defendant moved for judgment as a matter of law pursuant to Rule 50(a), arguing that "there has been no evidence provided to the jury on which they could base . . . any damage calculation." (UTR 8/9/18 at 3). The Court found that there was sufficient record evidence to support a jury determination of lost wages from December 2,

2015, through January 11, 2017, based on the wage reports in evidence. (*Id.*) The Court noted, however, that it would be up to the jury to determine if other damages were warranted, including damages that may have accrued after he left Van Chevrolet and his knee surgery. The Court denied Defendant's Rule 50(a) motion.

As to an award of damages and mitigation the jury was instructed:

1. <u>Award</u>: Back pay includes any lost pay the plaintiff would have received from the date the defendant discharged the plaintiff to the date of trial. The plaintiff has the burden of proving both the existence and the amount of back pay by a preponderance of the evidence.

2. <u>Mitigation of Back Pay Award</u>: The plaintiff has a duty to undertake reasonable measures to minimize his damages and the defendant is not required to compensate the plaintiff for avoidable damage. Thus, your award of back pay should be reduced by the amount of damages that the plaintiff actually avoided, or could have avoided, if he had made reasonable efforts. The defendant has the burden of proving by a preponderance of the evidence that a reduction should be made and the amount by which the award should be reduced.

Therefore,
   a. You must deduct any wages or other earnings that the defendant proved that the plaintiff received from other employment for the date the defendant discharged the plaintiff to the date of trial.

   b. If the defendant proves by a preponderance of the evidence either: (i) that the plaintiff unjustifiably failed to take a new job of like kind, status, and pay which was available to plaintiff, or (ii) that the plaintiff failed to make reasonable efforts to find such new job;
   You must subtract from the back-pay award the amount of money you find that the plaintiff could have earned from the time the plaintiff could have obtained such new job or should have obtained from such new job, had he made reasonable efforts to find such new job to the date of trial.

(Doc. 86 at 11-12).

Defendant argued that the evidence showed that "[Plaintiff] was terminated on December 2 [and] he obtained new work on January 11. And that work ended in April as a result of doctor's orders relative to his knees or, because of conditions of his knees." (*Id.*) Therefore, Defendant argued that Plaintiff would not be entitled to damages beyond April because he was unable to work for reasons beyond Defendant's control and because he

voluntarily ended his job at Van Chevrolet. (*Id*.) Moreover, Defendant argued that there is no basis for a wage loss claim because Plaintiff was making the same amount of money at Van Chevrolet. Finally, Defendant argued that there was no record evidence of Plaintiff's claimed losses between December 2, and January 11, and because his wages were based on "flag hours" worked, there would be no way that a jury could calculate his losses.

Plaintiff first conceded that front pay is not an issue, but as to back pay he argued that there was sufficient testimony and evidence in the record, including wage reports showing his amount of quarterly earnings for one year (Pl.'s. Tr. Ex. 16) and testimony about his rate of pay and "flag hours" worked. Therefore, Plaintiff argued that there was enough information in the record to allow the jury to conclude what he was making on average for several time periods during his last year of employment with Southwest Collision, including several months leading up to his termination. The Court agrees.

Moreover, Plaintiff produced evidence that he actually sought and found work at Van Chevrolet for $17.00 an hour. By its verdict, the jury reduced Plaintiff's damages by the amount he earned from January 12 through April 28, 2016 at Van Chevrolet. Defendant failed to show by a preponderance of the evidence that Plaintiff's award should have been further reduced because he unjustifiably failed to take a new job, or that he failed to make reasonable efforts to do so. To the contrary, Plaintiff testified that although he ceased looking for work due to knee surgery, at time of trial, he was actually working. Accordingly, Defendant's Renewed Motion for Judgment as a Matter of Law (Doc. 88) is denied.

**2.       Defendant's Motion for a New Trial – "Same Actor Inference" (Doc. 89)**

Defendant asserts that the "same actor inference" instruction should have been given to the jury and that the Court's failure to do so denied it a fair trial. (Doc. 89 at 1-2). Plaintiff responds that the Court properly refused to give the instruction because Defendant never presented evidence "that the 'same actor' was responsible for Mr. Torgyik's hiring and his firing." (Doc. 96 at 2). In retort, Defendant, citing out of circuit cases, argues that

it is entitled to the same-actor inference instruction "regardless of how minimal or weak that evidence is." (Doc. 89 at 1). Plaintiff also states that Defendant waived his objection because it failed to object to the jury instructions and it failed to request a special verdict. (Doc. 96 at 4). Defendant argues that it preserved the issue by requesting the instruction in the first instance. (Doc. 98 at 5). The Court will address each argument in turn.

### a. Legal Standards

"Where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Schechner v. KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012) (quoting *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996)). There is no bright-line on what constitutes "a short period of time." An examination of cases shows that the 9th Circuit has not hesitated to uphold the inference where the actions were taken roughly a year apart. *E.g., Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1286 (9th Cir. 2000) (taking the inference into account where the "decisions to hire and then to terminate were about a year apart"); *But c.f. Schechner*, 686 F.3d at 1026 (the inference "also may arise when the favorable action and termination are as much as a few years apart") (citing *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1097 (9th Cir. 2005)). Notably, the "inference [also] applies to favorable employment actions other than hiring, such as promotion." *Schechner*, 686 F.3d at 1026. In *Coghlan*, the 9th Circuit held that the inference was justified even though three years had elapsed between hiring and the earliest discriminatory decision because there were other subsequent favorable actions, after hiring, which occurred roughly one year before the first discriminatory events. *See Coghlan*, 413 F.3d at 1097. And, *Bradley v. Harcourt, Brace & Co.,* therefore, limited its holding to actions occurring "within a short period of time." *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996) (citing *Lowe v. J.B. Hunt Transp., Inc.*, 963 F.2d 173 (8th Cir. 1992) (implying the inference where actions occurred less than two years apart)).

…

**b. Discussion**

At the outset, the Court notes that neither party addresses the "short period of time" element of the instruction. Here, Plaintiff was hired on October 31, 2011, and fired on December 2, 2015. Thus, over four-years had elapsed between his hiring and firing. Unlike *Coughlin*, there was no evidence that Plaintiff received favorable treatment or promotions in the interim period. Thus, the Court finds that the four-year time lapse between Plaintiff's hiring and firing, alone, justifies not giving the same actor inference instruction. Nonetheless, the Court will also address the factual record.[6]

The testimony and evidence showed that Plaintiff started working for Southwest Collision as a body technician on October 31, 2011. The parties agreed that Galowicz hired Plaintiff. (*See* Tr. of Final Pretrial Conference on Aug. 2, 2018) at Doc. 59 at 6 (reflecting Plaintiff's counsel statement that "[w]e're not disputing that Mr. Galowicz is the one who hired Mr. Torgyik"). Plaintiff was fired on December 2, 2015. At the pretrial hearing, the parties were less certain about what the evidence would show as to who actually fired Plaintiff. (*Id*.) They ultimately agreed that the Court would need to determine whether the "same actor inference" jury instruction was warranted based on the trial evidence. (*Id*.)

Three witnesses testified about who fired Plaintiff, Plaintiff Torgyik, Galowicz, and KJ Nellis. Plaintiff's counsel asked KJ to "tell the jury [] the main reason that you decided to terminate Alex," and KJ responded that "he did not produce the quality of work that I was required to sell." (UTr. 8/8/18 at 17). KJ further explained that "[H]e was let go this exact day because he was very angry he was very profane . . . so we parted ways that day[.]" (*Id* at 19). KJ further testified about a termination notice that he filled out explaining the termination. Galowicz testified that he was not in the shop at the time Plaintiff was fired. (*Id.* at 138). He stated that KJ informed him that "Alex quit during the heated conversation" but later KJ clarified that "it was actually discharge." (*Id*. at 140). There are no facts in

---

[6] The parties, in part, base their argument on what would be or was argued in Plaintiff's closing argument. However, the jury was instructed that the lawyers opening and closing arguments are not evidence. Thus, the Court has likewise not considered them. *See* 9th Cir. Civ Jury Instr. 1.10.

- 10 -

the record to show that Galowicz was present when Plaintiff was fired.

Defendant did not produce evidence to persuade the Court that Galowicz fired Plaintiff. Rather, Defendant went to great lengths to show that it was KJ Nellis who fired Plaintiff. For instance, Defendant's counsel asked Galowicz "[d]id KJ have authority to fire employees" and he responded "yes." (*Id.* at 207). Counsel further asked "was [Plaintiff] the only employee that KJ ever fired" and Galowicz replied "no." (*Id.*). Finally, counsel asked Galowicz "[d]id KJ contact you on December 2 before he fired [Plaintiff] to seek your permission" and he replied "no." (*Id.*) These questions along with Defendant's stipulated description of the case that Plaintiff was fired for insubordination infers that KJ Nellis fired Plaintiff. (Doc. 40 at 4).[7]

Moreover, at the close of trial, the parties agreed that the following fact stipulations be read to the Jury: "1) George Galowicz hired Mr. Torgyik, and 2) Kevin KJ Nellis informed Mr. Torgyik that he was terminated on December 2, 2015." (Doc. 86 at 18). The parties also agreed that the jury be instructed that "[p]laintiff's employment with Defendant was 'at will'. This means that Defendant was free to discharge him for any reason or for no reason at all as long as it did not discharge him for an unlawful reason." (*Id.* at 14). Thus, the combined record supports that the Defendant was not entitled to the "same actor" inference.

Obviously, the jury ultimately determined that Defendant discharged Plaintiff because of his age, and presumably that Galowicz's treatment of Plaintiff was the impetus for his firing. Yet, based on the evidence and testimony, a reasonable juror could have concluded that KJ Nellis fired Plaintiff for insubordination. The testimony about Plaintiff's use of profanity, coupled with the stipulated jury instructions that Plaintiff was an "at will" employee, and the stipulated fact that "Kevin KJ Nellis informed Mr. Torgyik that he was terminated on December 2, 2015" could have convinced a juror that KJ Nellis, not

---

[7] In the preliminary instructions, the parties agreed that the following brief summary of their positions be read to the jury: "Plaintiff, . . . alleges that [Defendant'[ terminated him because of his age. [Defendant] denies that it terminated [Plaintiff] because of his age, but rather it terminated him for insubordination." (Doc. 40 at 4).

Galowicz, fired Plaintiff.

As to whether Defendant waived his objection to the "same actor inference" instruction, the Court finds that he did not. First, as noted, in pretrial, Defendant did submit the instruction, but he agreed that the Court would have to await a full development of the evidence and testimony to determine if it should be given. At close of trial, the Court informed the parties that the record did not support giving the instruction to which Defendant's counsel replied, "there is evidence from which the jury could infer that if Mr. Torgyik was in fact terminated because of age it was done so at the behest of Mr. Galowicz." And, essentially, Plaintiff's counsel agreed. But the Court explained that the same actor inference instruction is an affirmative defense and based on the record, it is not warranted. Therefore, Defendant preserved and did not waive his objection, but the Court determined that the instruction was not warranted as a matter of law. Based on the foregoing, Defendant's Motion for a New Trial (Doc. 89) is denied.

### 3. Plaintiff's Motion for Findings and Conclusions & Entry of Final Judgment (Doc. 85)

The Court need not make findings of fact regarding the ACRA claim, and the parties both agree. First, during trial, both parties agreed that the elements for the ACRA claim were identical to the federal age discrimination claim and thus, only one instruction needed to be given. (UTr. 8/10/18 at 234-35). *See Matos v. City of Phoenix*, 859 P.2d 748, 754 (Ariz. Ct. App. 1993) ("[c]ases analyzing the Age Discrimination in Employment Act of 1967 . . . are relevant in interpreting the comparable ACRA provision on age discrimination.") (citations omitted). Thus, given the jury verdict on Plaintiff's ADEA claim, the Court finds that Plaintiff likewise prevailed on his ACRA claim. Therefore, the Court will enter final judgment for Plaintiff on that claim. Because Plaintiff does not seek additional relief under the ACRA, the Court need not determine such relief.

#### a. Liquidated Damages

Plaintiff next moves for liquidated damages based on the jury's finding that Defendant acted willfully in violating the ADEA. (Doc. 85 at 3). The ADEA authorizes

courts "to grant such legal or equitable relief as may be appropriate to effectuate the purposes" of the act, which includes awarding "liquidated damages." 29 U.S.C. § 616(b). An award of both liquidated damages and prejudgment interest are appropriate under the ADEA because "liquidated damages and prejudgment interest serve different functions in making ADEA plaintiffs whole." *Criswell v. Western Airlines, Inc.*, 709 F.2d 544, 556 (9th Cir.1983), *aff'd,* 472 U.S. 400 (1985). Moreover, liquidated damages are "a substitution for punitive damages and [are] intended to deter intentional violations of the ADEA." *Kelly v. American Standard,* 640 F.2d 974, 979 (9th Cir. 1981).

Plaintiff requests an award of liquidated damages in the full amount awarded to him by the jury plus prejudgment interest, for a total of $47,007.84. Defendant did not respond to Plaintiff's request for liquidated damages, and thus did not dispute Plaintiff's request. Here, the jury found that the Defendant acted willfully in terminating Plaintiff. The Court finds that the jury's determination of willfulness is supported by the record. Among other evidence, Galowicz testified that at the time Plaintiff was fired, Southwest Collision had no policy on age discrimination, there was ample testimony about Plaintiff's age as it related to his capacity to be trained, his longevity with the Defendant and testimony of relocating Plaintiff to another body repair shop. In addition, Defendant hired a more youthful body man which resulted in Plaintiff's work space reduction. *See Cassino v. Reichold Chems., Inc*. 817 F.2d 1338, 1348 (9th Cir. 1987) *cert. denied*, 484 U.S. 1047, 108 S.Ct. 785 (1988) ("[w]illfulness may be shown by circumstantial evidence including statistical evidence and discriminatory statements."). The purpose behind an award of liquidated damages is to deter future discriminatory conduct. The Court finds that based on the jury finding of willful conduct, an award of liquidated damages is appropriate. *See* 29 U.S.C. § 616(b). The Court finds, in its discretion, that an award of $47,007.84 is sufficient to punish Defendant for the ADEA violation and deter Defendant from future violations.

### b. Pre-Judgment Interest

The only remaining issue to resolve in this motion is whether Plaintiff is entitled to

pre-judgment interest. "An award of prejudgment interest on a back pay award is appropriate." *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1446 (9th Cir. 1984). Prejudgment interest is intended to compensate "the loss of use of this money during the period payments [are] withheld from [ADEA plaintiffs]." *Criswell,* 709 F.2d at 556–57. In calculating prejudgment interest, the Court will use the weekly average 1-year constant maturity Treasury yield. *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 628 (9th Cir. 2007) ("Generally, the interest rate prescribed for post judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of prejudgment interest unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.'" (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163-64 (9th Cir. 2001)).

At the date judgment was entered on August 10, 2018, the weekly average Treasury yield for calculating interest was 2.44%. The period between the date of termination and the date of judgment encompassed 983 days. Plaintiff is seeking prejudgment interest on the jury award of $44,109.30, for a total amount of interest of $2,898.54. Defendant does not contest the interest calculation but argues that Plaintiff is not entitled to prejudgment interest because "his damages were not easily ascertainable but rather where [sic] dependent upon the jury's discretion." (Doc. 91 at 2). However, Defendant cites to no authority for its argument that "Torgyik is not entitled to prejudgment interest because the amount of his damages was subject to jury's discretion." (*Id.* at 4). The Court, in its discretion, will award prejudgment interest in the amount of $2,898.54. The Court will also award Plaintiff court costs in this matter as set forth in his Motion, in the amount of $3,287.92. Defendant did not object to this request.

**4.     Plaintiff's Application for Attorneys' Fees (Doc. 83)**

The final matter before the Court is Plaintiff's Motion for Attorneys' Fees (Doc. 83). Plaintiff requests an award of attorneys' fees in the amount of $31,780.00 pursuant to 29 U.S.C. § 626(b), A.R.S. § 41- 1481(J), Rule 54(d)(2) of the Federal Rules of Civil Procedure, LRCiv 54.2, and the Clerk's Judgment dated April 10, 2018. (Doc. 83).

Defendant does not object to the hourly rate or the number of hours billed in this case but argues that the amount sought by Plaintiff is excessive in light of his "limited degree of success at trial." (Doc. 90).

### a. Legal Standards

Prevailing plaintiffs are entitled to an award of attorney fees and related non-taxable expenses pursuant to the ADEA, which incorporates the attorney's fees provision from the Fair Labor Standards Act of 1938 ("FLSA"). *See* 29 U.S.C.§ 216(b) ("The court in such action *shall*, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.") (emphasis added). An award of attorneys' fees for a prevailing plaintiff is mandatory under the FLSA provision. *See Christiansburg Garment Co. v. EEOC*, 434 U.S.412, 415 n.5 (1978) (FLSA is one of the "statutes [that] make[s] fee awards mandatory for prevailing plaintiffs"); *Orozco v. Borenstein*, 2013 WL 655119, at *2 (D. Ariz. Feb. 21, 2013) ("It is not only appropriate to award fees to a successful plaintiff, *it is mandatory*.") (emphasis added).

"In the federal system statutory fees are typically awarded by the court under the lodestar approach." *Comm'r v. Banks*, 543 U.S. 426, 438 (2005). "The 'lodestar' is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." *Morales v. City of San Rafael,* 96 F.3d 359, 363 (9th Cir.1996). "After computing the 'lodestar,' the district court may then adjust the figure upward or downward taking into consideration twelve 'reasonableness' factors: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, n.11 (9th Cir. 2012) (internal citations omitted).

Once civil rights litigation materially alters the legal relationship between the parties, "the degree of the plaintiff's overall success goes to the reasonableness" of a fee award. *Hensley v. Eckerhart*, 461 U.S. 424 (1983). The Ninth Circuit has specifically instructed that "courts should not reduce lodestars based on relief obtained simply because the amount of damages recovered on a claim was less than the amount requested." *Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988). "Moreover, in *City of Riverside,* the Supreme Court, in the context of civil rights statutes, expressly rejected the proposition that fee awards must be in proportion to the amount of damages recovered." *Evon*, 688 F.3d at 1033 (9th Cir. 2012); *See City of Riverside,* 477 U.S. at 574 (affirming fee award of $245,456.25 when damages recovered were only $13,300).

**b.  Discussion**

Plaintiff argues that his request for $31,780.00 is a reasonable amount under the lodestar approach, based on the amount of work expended in this case, the difficulty in securing a positive jury verdict on an ADEA claim, and on the fact that the jury found for Plaintiff. (Doc. 83). Defendant does not object to the hourly rate or the number of hours billed in this case. Rather, Defendant argues that the overall fee request in unreasonable based on the jury verdict. (Doc. 90).

First, under the 'lodestar' approach, the Court finds that the number of hours spent on the case, multiplied by the hourly rate of counsel, is $31,780.00. The Court will next consider the twelve reasonableness factors to determine whether the fee request is reasonable. The Court need not consider all factors equally. *See Evon*, 688 F.3d at 1015. The Court finds that both parties diligently litigated this case, which resulted in a jury trial. Therefore, the time and labor required from counsel was substantial. Plaintiff concedes that the legal questions were not particularly novel; however, he argues that the application of the "but for" test in age discrimination cases makes the preparation and development of the case difficult. The Court agrees. The Court finds that counsel performed the legal service properly, using expertise in this area of the law. Moreover, the Court finds the experience, reputation, and ability of counsel to weigh in favor of granting the Motion.

Attorney Carden states in his declaration that "there were other cases which presented themselves while this case was being litigated, which counsel was precluded from undertaking due to the time required on this matter." (Doc. 83). Based on Carden's declaration, the Court finds that this case did preclude other employment, and that the work on this case, particularly the jury trial, imposed limitations on Carden's other cases. As to the hourly rate, and whether the fee is fixed or contingent, Defendant states that it has no objection to the rate charged and the Court finds the rate of $350 per hour to be reasonable. (Doc. 90). As to the amount of recovery obtained, the jury awarded the full amount that was requested by Plaintiff at trial. Plaintiff states that there are many reasons that this type of a case is undesirable, including working on a case for years through jury trial with the possibility of no recovery for the plaintiff and very little, if any fees paid. The attorney-client relationship has spanned from the case filing to the jury verdict and continues post-trial. Lastly, to show that his request is reasonable in light of other cases, Plaintiff cites to numerous cases where attorney fee awards are in *excess* of the jury award to a plaintiff. *See, e.g., Avila v. L.A. Police Dep't*, 758 F.3d 1096, 1105 (9th Cir. 2014) (upholding award of $579,000 in attorney fees to employee whose damages were only $50,000 in FLSA retaliation case); *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1468 & 1473 (9th Cir. 1983) (upholding award of $100,000 in attorney fees for an FLSA recovery of $18,455); *See also Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 610-11 (7th Cir. 2014) (upholding award of FMLA attorneys' fees in the amount of $325,000 despite plaintiff's recovery of less than $50,000 in damages).

Defendants cite the *Farrar* case for its argument that the fee here is unreasonable based on the jury verdict. However, the facts in *Farrar* are very different from this case. *See Farrar v. Hobby*, 506 U.S. 103, 114 (1992) ("If ever there was a plaintiff who deserved no attorney's fees at all, that plaintiff is Joseph Farrar. He filed a lawsuit demanding 17 million dollars from six defendants. After 10 years of litigation and two trips to the Court of Appeals, he got one dollar from one defendant."). Defendants concede that the hourly rate and the number of hours billed in this case are reasonable. (Doc. 90).

The Court finds that all twelve of the reasonableness factors weigh in favor of awarding Plaintiff the full amount of attorneys' fees sought in his Motion. Here, the amount sought by Plaintiff for attorneys' fees is less than the verdict amount awarded by the jury. Moreover, upon review of Plaintiff's motion and supporting documentation, the Court finds Plaintiff's fee request to be reasonable. Plaintiff has demonstrated that the rates charged, the hours expended, and the costs incurred are reasonable for this case. Considering all of the above, the Court will grant the motion and award an amount of $31,780.00 in attorneys' fees.

Accordingly,

**IT IS ORDERED** that Defendant's Renewed Motion for Judgment as a Matter of Law (Doc. 88) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for a New Trial (Doc. 89) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Final Judgment (Doc. 85) is **GRANTED**. The Clerk of Court shall enter judgment in favor of Plaintiff and against Defendant on Plaintiff's ADEA claim in the amount of $44,109.30 in back pay and $2,898.54 in prejudgment interest for a total judgment amount of **$47,007.84**. The Court further awards Plaintiff post-judgment interest on all applicable amounts in accordance with 28 U.S.C. § 1961 from the date this judgment is entered until paid at the rate of 2.44% per annum.

**IT IS FURTHER ORDERED** that Plaintiff is awarded **$47,007.84** in liquidated damages and **$3,287.92** in Court Costs.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Attorneys' Fees (Doc. 83) is **GRANTED**. Plaintiff is entitled to attorney fees in the amount of **$31,780.00**.

…

…

…

…

**IT IS FINALLY ORDERED** that the Clerk of Court shall enter an amended judgment in accordance with this Amended Order.

Dated this 2nd day of April, 2019.

_____
Honorable Diane J. Humetewa
United States District Judge